DUFRESNE, Judge.
This is an appeal by Douglas McDaniel, plaintiff-appellant, from an adverse jury verdict in a personal injury action brought by him against Sharp Electric, Inc., defendant-appellee. Because we do not find that the decision of the jury was manifestly erroneous, or that plaintiff was prejudiced by the trial judge’s ruling not to permit certain cross-examination of a defense expert witness, we affirm.
At the time of the alleged injury of October 20, 1980, McDaniel was working as a carpenter for Pittman Construction Co. at a construction site on the campus of Southeastern Louisiana University in Hammond. His version of the alleged accident was that he was standing on a scaffold holding a rotary saw in his right hand. In stooping down to cut a piece of plywood, he balanced himself by grabbing with his left hand a reinforcing rod protruding from a concrete column next to the scaffold. When he grabbed the rod, he claims that he was shocked, and was unable to release either the rod or the saw. He yelled to a co-worker, who unplugged the saw. According to McDaniel and two co-workers, this alleged shock lasted between eight to fifteen seconds. The saw was not running at any time during the alleged incident.
McDaniel was taken to a hospital by ambulance. On admission he complained of chest pains, fluttering heart beat, and chills. He was kept at the hospital for three days for observation, and then discharged with a final diagnosis of “electrical shock”. Following discharge, he continued to complain of aches and pains, fatigue, lack of ability to concentrate, irascibility and personality changes. Except for a brief period, he has not been employed since the day of the claimed accident.
McDaniel subsequently brought suit against numerous parties, all of whom were dismissed at the close of the evidence by the trial judge, except for Rockwell International Corporation, the saw manufacturer, and Sharp Electric Inc., the electrical contractor on the job. The jury returned a verdict in favor of these latter two defendants. McDaniel now appeals only the verdict in favor of Sharp Electric, Inc. and urges two grounds for reversal:
1. The verdict was manifestly erroneous in that the jury did not find per se negligence on the part of Sharp; and
2. The trial court erred in limiting cross-examination of Sharp’s electrical expert as to possible causes of the accident.
In regard to the first alleged error, we reiterate the well established rule that a reviewing court will not disturb findings of fact made by a jury absent manifest error in those findings, Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). Our review of the record satisfies us that the findings of the jury were not manifestly erroneous.
To assist the jury, a list of interrogatories was provided, only the following one of which is pertinent here:
2. Do you find from a preponderance of the evidence that the defendant, Sharp Electric, Inc., was negligent in the manner claimed by the plaintiff and that such negligence was a legal cause of damage to the plaintiff?
_Yes _No

(The jury answered no.)

McDaniel now argues that there was unrefuted evidence that Sharp violated a statutory duty in designing the electrical system, was therefore per se negligent, and the jury’s finding to the contrary was clearly wrong. Sharp, however, correctly urges that the test for per se negligence also includes the additional factors of causation and resulting injury, Carter v. City Parish Government of East Baton Rouge, 423 So.2d 1080 (La.1982).
*810 The jury was thus called upon to make three factual determinations:
1. Was the plaintiff injured? If so,
2. Did Sharp violate a statutory duty to protect the plaintiff? If so,
3. Was that violation causally related to the injury?
A negative answer to any one of these questions would of course exonorate the defendant from liability.
As will appear more fully below, Sharp did violate a statutory duty designed to protect McDaniel from certain risks of harm. Our inquiry is thus limited to the remaining two factors, i.e. injury and causation. We also note that the interrogatory required the jury to decide both of these questions when it asked whether the negligence “was a legal cause of damage to the plaintiff?” (emphasis added). We cannot know whether the jury answered both of these questions in Sharp’s favor, or only one. However, in reviewing the evidence as to both questions, we cannot say that the jury was clearly wrong if it answered either, or both, in the negative.
We turn now to the conflicting evidence of the alleged injury. As noted above, McDaniel stated that he was shocked. Two co-workers testified that he began hollering and appeared to be suffering a shock. They further stated that when the cord was unplugged, he slumped down on the scaffold, complained of being cold, was shaking, and was unable to climb down.
Because of complaints of chest pain and heart flutter at the hospital, he was immediately given an EKG, a chest X-Ray, CPK enzyme studies, and a physical examination. Dr. M.L. Winkler, the treating physician, testified via video deposition, that the EKG was normal. She also stated that the CPK enzyme studies, which are designed to reveal heart muscle strain or damage, were normal. Although the hospital records noted that no rales were heard in the chest, the doctor stated that this was an error in those records. Her testimony was that she did detect rales and further that in her opinion the chest X-ray revealed pulmonary edema, a fluid buildup in the lungs, which she considered consistent with McDaniel’s complaint of prior heart flutter. Further X-rays taken on the following days showed that the edema had resolved itself. No burns were noted on the hands. Her conclusion was that he had indeed been shocked.
After discharge, McDaniel continued to complain of soreness, fatigue and coldness in his left arm and hand, and consulted Dr. Glen Hebert, an internist. Initial EKG studies were again normal, but after several months further EKGs revealed, in that doctor’s opinion, irregularities indicative of fibrosis or scarring in the heart muscles. Dr. Hebert also noted the coldness in the left arm, and attributed this to probable nerve damage which affected the flow of blood into the arm. His diagnosis was post-electrical shock syndrome.
In June 1981, upon the suggestion of his attorney, McDaniel consulted Dr. Walter G. Robinson, a neuropsychiatrist, who was still treating him at the time of trial. After extensive testing and treatment, Dr. Robinson concluded that he thought McDaniel was suffering from post-traumatic electrical shock syndrome, which manifested itself in severe depression, aches and pains, fatigue and coldness in the left arm. He further stated that the first brain wave or EEG test which he performed was normal, but the second showed borderline abnormality. As to the prognosis, the doctor stated that progress could not be made until certain external problems could be resolved. The first was that his wife of 19 years had left him, in part because she originally thought he was not really injured and was shirking his responsibilities, and in part because he had threatened her with a gun. Until that matter was finalized either by divorce or reconciliation it would impede recovery. The second was the present law suit which required McDaniel to be examined repeatedly by doctors and lawyers who were holding him under a “microscope”. He further revealed that it was a continuance of a previous trial date that had caused McDaniel to “go beserk” and threaten his wife with the gun.
*811 Finally, Dr. Laxman Kervalramaini, an expert in physical medicine, did therma-graphic studies on McDaniel and found a temperature differential between the left and right sides of his body.
By way of rebuttal the defense called Dr. Luke Glancy, a cardiologist, to whom McDaniel had been referred for evaluation by Dr. Hebert. Dr. Glancy ran an EKG on the patient which was normal. He also reviewed all of Dr. Hebert’s EKGs as well as those from the hospital and found them normal, with no indication of fibrosis. He stated that as a heart specialist he reviewed chest x-rays daily. His examination of the x-rays taken at the hospital showed no sign of edema. He also stated that rales are no longer considered a reliable sign of fluid in the lungs. He tested McDaniel for coldness in his left arm, but was unable to discern any temperature variation. His conclusion was that “I couldn’t find anything wrong with the man”.
Dr. Gregory Ferris, a neurologist, also testified for the defense. He reviewed all of the EEG tests performed by Dr. Robinson, and concluded that those tests were normal and did not establish any abnormality in the brain. He also stated that experiments have shown that electricity passing through the body would not produce significant electricity in the brain, unless the person was grounded on the top of his head.
A third doctor, Robert L. Newman, a psychiatrist, also examined McDaniel and reviewed the hospital records and Dr. Robinson’s clinical notes, as well as McDaniel’s diary of his symptoms which was kept on request of Dr. Robinson. His conclusion was that there was “strong pointing to malingering”. He based this opinion first on the fact that the hospital records, especially the enzyme studies, as well as Dr. Glancy’s records, revealed no objective evidence of heart or nerve injury. Second, he noted that although the patient complained of inability to concentrate, the diary was extremely detailed as to daily symptoms and indicated an ability to concentrate quite well on things that he wanted to concentrate on. Third, he did not diagnose any clinical depression because the bouts of depression claimed, although recurring, were of short duration, rather than lasting for protracted periods of one or two months as would be expected. He also noted in the patient an almost obsessive preoccupation with deterioration of his body, as well as a feeling of entitlement to the anticipated proceeds of this law suit which McDaniel referred to as “my money”.
Dr. Monroe Samuels, a pathologist, also appeared. His testimony was that if a person received an electrical shock sufficient to cause heart damage, then he would expect the CPK enzyme levels to be elevated. However, in reviewing the hospital records, he found these levels to have been normal.
On the issue of how the alleged shock might have occurred, or if indeed it did occur, there was again conflicting evidence. We note initially, however, that there is no question that the temporary electrical system built by Sharp was defective. Their contract specified that all electrical work was to be done according to the standards fixed by the National Electric Code. Moreover, because the construction job was being done for the state, La.R.S. 40:1722(B)(5), also mandated that the National Electric Code requirements be met. That code provides that all temporary electric services on construction jobs are to be equipped with ground fault circuit interrupters (G.F.C.I.’s). These devices were originally installed by Sharp, but were disconnected when Pittman personnel complained of “nuisance tripping” caused by the use of long extension cords. Sharp was thus clearly in violation of the statute.
All of the electrical experts agreed as to how these devices work. Essentially, they monitor the amount of electricity going through the black or “hot” wire to the power tools, and compare it to the amount of electricity coming back from the tools via the white or “neutral” wire. If the device detects any appreciable difference between these currents, it automatically *812 shuts off the current in about one fortieth of a second. Thus, if any power is escaping the circuit, either by coming back to ground via the green or “ground” wire, attached to the tool or by shocking someone and going through them to ground, and therefore reducing the current returning in the white wire, the circuit would be interrupted.
It was further established that the saw was properly equipped with a three prong plug, which was plugged into an extension cord. However, the ground plug pin of the extension cord was missing. This cord belonged to Pittman and was in its custody and control. Thus, while the black and white wires formed a complete circuit through the saw switch, the green wire attached to the saw casing did not go back to ground and therefore provided no protection to the worker in the event that current got from the black wire into the saw case itself.
McDaniel’s argument here for per se negligence is that the purpose of the National Electric Code requirement for use of G.F.C.I.’s, is to provide a second level of protection to workers in the event that the primary grounding system is not in place. Specifically, he put on evidence to show that it frequently happens, as in this case, that the ground plug pins on extension cords and tools are broken off or otherwise damaged. Because this problem is common in the industry, the G.F.C.I. was developed and became required equipment for the temporary electrical service on construction jobs to further protect workers. He further sought to prove that had the G.F.C.I.’s been in place, the current going through his body would have created a differential between the black and white wires sufficient to trip the circuit and the shock would thus have lasted only one fortieth of a second and not injured him.
We agree that the purpose of the regulation is to protect workers from the type of injury alleged to have occurred here, and that if McDaniel was in fact shocked and suffered consequent damages, that per se negligence would have been established. Again, however, the evidence was conflicting as to whether a shock occurred or how it might have occurred.
Mr. James Hrivnak, Rockwell’s expert in electrical engineering, saw design, and the effects of electricity on the body, testified by way of video deposition, that he had conducted extensive tests on the saw. His conclusion was that no electricity had ever gone into the case of the tool which might have shocked someone. That conclusion was based on the complete absence of any signs of arcing within the saw. He admitted that a moisture path within the saw could have permitted current to enter the case without leaving evidence of arcing. He also stated, however, that had current sufficient to injure McDaniel gone through him to the re-bar, that his hands would have been burned. He explained that the skin has a high resistance to electricity, generally over 1000 ohms. He stated that internal injury occurs when the skin is broken by a burn thus permitting the current to flow much more readily through the body’s interior. He further said that he never read of any electrical injuries to a person whose skin had not been broken by burns. In addition, he was of the opinion that it would be next to impossible for enough wet sawdust to have accumulated at critical points in the saw motor to cause a shock.
Prior to trial, this deposition and the tests results were made available to the experts for both McDaniel and Sharp. Dr. Frederick Brown, an electrical engineer also trained in bio-mechanics, testified for the plaintiff. His opinion was that the absence of arcing was not conclusive that the case of the saw had not become energized. He postulated three theories to explain how the case may have been energized without leaving evidence of arcing. The first was that there may have been a moisture path within the saw created by a buildup of wet saw dust. The second was that the plug with the broken ground pin may have been in a puddle of water, thus allowing the current to flow from the black or “hot” wire through the water and up the *813 green or “ground” wire to the saw handle. The third was that the insulation on the black and green wires may have been damaged and those bare wires may have been touching within the extension cord, thus allowing current to flow up the green wire to the saw handle. In regard to this third possibility, actual proof was lacking because only a portion of the extension in use at the time of the alleged shock was available at trial, and that portion was not damaged. Dr. Brown concluded that if any one of these three things had happened, a properly installed G.F.C.I. would have prevented the shock.
Dr. Leonard Adams, an electrical engineer, appeared for Sharp. As to Dr. Brown’s second hypothesis, i.e. that the broken plug may have been wet, thus allowing current to flow from the black to the green wire, Adams concluded that it was physically impossible for enough current to reach the saw case in this manner either to trip a G.F.C.I., or to be noticeable to a worker. In support of this conclusion, he videotaped an experiment wherein he plugged an extension with a broken ground pin into another extension which was in turn plugged into an electrical outlet. He then thoroughly wet the broken plug, plugged a saw into the other end of the cord, and checked with instruments for any current that might be flowing up the green wire. He found none. He also stated that the portion of the extension cord in evidence appeared to be a “relatively not much used cord”. Moreover, plaintiff’s counsel read to the jury a portion of Dr. Adam’s prior deposition wherein he testified that although a possibility existed that a damaged extension might have a contact between the black and green wires, he held that “as a very low probability”.
As the above summary of the evidence presented shows, there was conflicting evidence as to whether the plaintiff suffered any injury from the alleged shock, or indeed whether he was shocked at all. The jury was called upon to determine the credibility and persuasiveness of the witnesses, and obviously found those for the defense more convincing. We recognize that this was a close case that might have been decided differently, but we are not empowered to reverse the jury’s verdict simply because we might have reached a different verdict. Rather, we are called upon to decide whether that verdict was manifestly erroneous or clearly wrong. The record simply does not disclose such error.
Plaintiff’s second argument is that the trial judge improperly excluded cross examination of Dr. Adams, Sharp’s expert. On cross examination, plaintiff’s counsel read the excerpt from the witness’s prior deposition mentioned above. This was obviously preparatory to a line of questioning on the possibility of current passing from the black wire to the green wire if the insulation were damaged in the extension cord. Defense counsel objected on the grounds that as there was no proof of a damaged cord, any hypothetical questions which assumed such damage were not supported by facts in evidence. The objection was sustained by the trial judge. Plaintiff asserts that this was reversable error. We disagree.
The possibility of current going from the black to the green wire was addressed extensively by both Dr. Brown and Mr. Hriv-nak. Moreover, the excerpt from the deposition was Dr. Adam’s answer to the following question, which was read to the jury:
“Would there be any possibility of the ground safety wire being energized between the point at which the ground safety plug was missing and the case of the tool?”
Adam’s full answer, also read to the jury was:
“Not a very good probability, but I guess the possibility does exist that a bad power cord between the saw and its point of attachment to the junction box, if the grounding wire inside were somehow caused to be in contact with the hot wire inside that cord, then the case could become energized. I hold that as a very low probability.”
*814 We fail to see what more counsel could have elicited from the witness on this point had further cross examination been allowed. Moreover, in light of the extensive testimony of the other experts on this issue, further testimony by Dr. Adams would have been merely redundant.
For the foregoing reasons, the judgment in favor of Sharp Electric, Inc. is hereby affirmed.
AFFIRMED.